# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

Civil Action Number: _____

***Jury Trial Demanded***

**J. CABELL BROCKMAN,**

    Plaintiff,

vs.

**NORFOLK SOUTHERN CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY, JERMAIN WILKINSON, and RODNEY MOORE,**

    Defendants.

## COMPLAINT

Comes the Plaintiff, J. Cabell Brockman, who asserts the following causes of action against Defendants, Norfolk Southern Corporation, Norfolk Southern Railway Company, Jermaine Wilkinson, and Rodney Moore. Plaintiff demands a trial by jury on all claims.

### Parties, Jurisdiction & Venue

1.  Plaintiff, J. Cabell Brockman ("Plaintiff") is an adult resident citizen of Hoover, Alabama. At all times material to this complaint, he was an employee of Norfolk Southern Corporation ("NSC") and worked as the railroad

1

superintendent of Norfolk Southern's Railway Company's ("NSRC") Gulf Division (formerly Alabama Division).

2. NSC is a corporation organized under the laws of the State of Virginia.

3. NSRC is a corporation organized under the laws of the State of Virginia, and at all times material to this complaint, it was a subsidiary corporation of NSC.

4. Defendant Jermaine Wilkinson ("Wilkinson") was, at all times material to this complaint, an employee of NSC and an NSRC company official, Network Operations General Manager, and one of Plaintiff's supervisors.

5. Defendant Rodney Moore ("Moore") was, at all times material to this complaint, an NS employee and company official, General Manager, and one of Plaintiff's supervisors.

6. This Court has federal question subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and the Federal Rail Safety Act, 49 U.S.C. § 20109(d)(3) ("FRSA").

7. Venue is proper in this division and district pursuant to:

    (a) 28 U.S.C. § 1391(b)(1),(c)(2),(d) because NS resides in this division and district; and

(b)  28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this division.

## FRSA Procedural History

8. On or about December 16, 2022, Plaintiff timely filed a FRSA complaint with the Regional Administrator of the Occupational Safety & Health Administration ("OSHA") pursuant to § 20109 of the FRSA and 29 C.F.R. Part 1982 regarding the claims made in this Complaint (Case No. 301008871).

9. The Secretary had not issued a final decision within 210 days of the December 16, 2022, OSHA complaint filing.

## Facts

10. NSC and NSRC, at all times material to this complaint, was engaged in the operation of a railroad for the transportation of freight for hire in interstate commerce.  It regularly and purposefully conducts business in Birmingham, Alabama, and maintains offices for the transaction of business in said county and state.

11. NSRC is, on information and belief, a wholly owned subsidiary corporation of NSC.  NSC employs the managers, such as Plaintiff and the Individual Defendants.  These managers, in turn, manage, and operate the

railroads, including NSRC, that are owned by NSC. NSC and NSRC will hereinafter be collectively referred to as "NS".

12. At all times material to this complaint, Plaintiff was working within the course and scope of his employment, and was an NS employee within the meaning of FRSA.

13. Brockman was the superintendent of NS's Gulf Division (formerly Alabama Division)., which consists of NS's tracks and railroads in Tennessee, Alabama, Georgia, Mississippi and Louisiana.

14. Moore, as Southern Region General Manager, was the direct supervisor of the three division superintendents in the Southern Region, including Brockman.

15. Wilkinson was the General Manager of NS's Network Operations Center ("NOC") in Atlanta, GA. On information and belief, the Atlanta dispatch center, the crew management department and the locomotive assignment and utilization center are in the NOC. The dispatchers operating under Wilkinson's supervision in the dispatcher center control NS road trains on the whole system. They make decisions such as what trains move when, where and the sequencing of such movements. If a crew is getting close to the end of their 12-hour Hours of Service (HOS) limit, dispatchers decide where such crews will "tie up" their trains and stop running. Dispatchers also make

decisions about whether or not trains will run when problems develop with engines and/or cars.

16. The dispatchers are supervised by Chief Dispatchers who report the Network Operations Center (NOC) led by Wilkinson and his assistant Andy Koch. Brockman tried to help the dispatchers with ways to better handle train crews, the HOS issues, how and where to tie up, and other safety problems and concerns, but the dispatchers and NOC would not listen. NOC's resistance to, and anger at, Brockman's attempts to report and correct these hazardous conditions caused consistent friction between the NOC, Brockman and Gulf Division supervision. Wilkerson argued with Brockman on many occasions and accused Brockman of trying to "run" his, Wilkinson's, department.

17. Brockman on many occasions also made such reports, as described above, to Moore, often after getting no help or satisfaction from Wilkinson and the NOC, much to Wilkinson's embarrassment and anger.

18. NS and Moore terminated Brockman on September 7, 2022. This was an adverse action within the meaning of FRSA. This termination was due, in whole or in part, to Brockman having engaged in a long series of protected activities. These protected activities include, but are not limited to, the following:

(a) The issues discussed in number 15 and 16 above.

(b) Brockman reported numerous times to Wilkinson and his subordinates, Moore and other NS managers, that NS dispatchers had tied up or stopped crews on mainlines in dangerous circumstances when the crews had worked up to the HOS limit. Crews were being left on trains for hours without relief creating serious safety hazards because the dispatchers would not let crews take the time to cut the trains and unblock public crossings. There were many complaints by the public about blocked crossings and Brockman was assigned by NS to do an interview with two local Birmingham, AL, television stations and to testify before an Alabama state legislative committee about the situation. Further, the train crew themselves were left without food and water and there were other safety issues.

(c) Brockman and his subordinates, at his direction, were reporting these kinds of hazards almost every day for months, including through the spring and summer of 2022. Brockman supported his subordinates when they reported such safety issues. These situations were often heated and greatly resented by NS, Moore, and Wilkinson.

(d) Brockman reported and argued with the NOC about a situation in which a dispatcher ordered a crew to tie up in a siding near

Anniston, AL, blocking public crossings. An intruder with a pistol got on the engine and threated the crew because a crossing was blocked. Brockman reported and complained about this and many other such examples to Wilkinson, his supervisor, Moore and others.

(e) He reported on at least two occasions when dispatchers had ordered train crews to violate federal safety regulations. In the first instance, NOC had ordered a crew to take a train to Chattanooga with an inoperable cab heater, a safety regulation violation. The Federal Railroad Administration (FRA) fined NS for the violation and Brockman's investigation of the matter revealed the NOC's improper order. He complained to Wilkinson about the violation. The NOC leadership was very angry at Brockman for reporting this situation.

(f) The second instance involved another FRA violation where the NOC ordered a crew to use a non-compliant locomotive in violation of the FRA safety regulation. Again, Brockman reported this situation up his chain to Wilkinson and he got mad at him again.

(g) There were other instances when the NOC ordered crews to violate the HOS law which involved dispatchers telling crews to pull their trains on to further points after they should have ceased service in

violation of the federal HOS rules and law.  The NOC management did not like being called on these violations.

(h) Brockman strongly complained to Wilkerson and the NOC about a movement of 28 carloads of dangerously misloaded pipe running all the way to Birmingham, Alabama, from east of Atlanta.  A train from Linwood, North Carolina to Birmingham this past summer had 30 cars of pipe in the consist.  A train crew reported to NS that one of these cars had pipe hanging off the side of the car, an unbelievably dangerous situation.  NS management went to the scene and decided to set only the offending car out to be reloaded properly, despite the fact that the pipe on all 30 cars was misloaded and extremely dangerous.  While setting the car out, the pipe on another of the cars fell off that car.  NS managed to set the two offending cars out, and NS and Wilkerson ordered the train, with 28 incredibly dangerous pipe loads, on to Atlanta and then to Birmingham, AL, operating at track speed. Brockman learned that this train was moving into territory for which he was responsible. He complained to Wilkinson, but before the dangerous cars got to his territory Wilkinson refused to change this decision.  These conversations were very heated. He could not overrule Wilkinson and the NOC, and the train went on to Birmingham where the pipe

cars were all set out and reloaded. It was a miracle no one was hurt or killed. Instead of appreciating Brockman's efforts to make the NS safer, NS, Wilkerson and Moore were angry with him for raising the issues.

(i) There are many other instances where Brockman reported safety hazards up to his supervisors above Wilkinson and to the NOC that made upper management livid at him.

19. All these reports and complaints to NS management and the FRA were protected activities.

20. Wilkinson and Moore felt threatened by the consistent reports of hazards and incidents in the past and warnings about hazards which would occur in the future. This came to a head in late August and Brockman was terminated because of his efforts to make NS a safer railroad.

21. Brockman's termination was due, in whole or in part to his protected activities, as described above. But for Brockman having engaged in these protected activities, NS's and the Individual Defendants' adverse actions would not have been taken against him.

22. All of these incidents, harassment and intimidation were illegal retaliation and discrimination and thus adverse acts within the meaning of FRSA and were attempts to have Plaintiff violate federal safety law requirements.

## Count One
## Retaliation Claims (49 U.S.C. § 20109)

23. Plaintiff adopts all factual allegations stated above as if they were fully stated herein.

24. NS, its officers, and/or its employees, including Individual Defendants Wilkinson and Moore, took adverse actions, as aforesaid, against Plaintiff and retaliated against him, and said retaliation was due, in whole or in part, to Plaintiff's lawful, good faith protected acts as aforesaid.

25. As a result of NS's and the individual defendants Wilkinson's and Moore's adverse actions, as aforesaid, Plaintiff has lost wages and benefits, and has also suffered from emotional distress, worry, fear, and humiliation because of NS's and the individual defendants Wilkinson's and Moore's wrongful conduct.

26. Plaintiff avers that he was caused to sustain and suffer all of the aforesaid injuries and damages as a result, in whole or in part, by the Defendants NS's, Wilkinson's and Moore's violations of the provisions of the FRSA, as described herein.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully requests that this Honorable Court: (1) enter judgment in his favor and against NS and the individual defendants Wilkinson and Moore; (2) award him compensatory damages for any and all damages he sustained as a result of the wrongful conduct; (3) award him punitive damages in an amount not to exceed

$250,000.00; (4) award him litigation costs, expert witness fees, and reasonable attorney fees in the prosecution of this action; and (5) grant him any and all relief necessary to make him whole.

***\*\* Plaintiff Requests a Trial By Struck Jury\*\****

Date:  August 3, 2023

        Respectfully submitted,

         */s/ W. C. Tucker, Jr.*
        William C. Tucker, Jr. (ASB-5308-t72w)
        bill@mtandj.com
        MAPLES, TUCKER & JACOBS, LLC
        2001 Park Place, Suite 1325
        Birmingham, AL 35203
        (205) 322-2333

        And

        F. Tucker Burge, Sr. (ASB-3705-e36f)
        ftb@burge-law.com
        F. Tucker Burge, Jr. (ASB-4462-r80b)
        ftbjr@burge-law.com
        BURGE & BURGE, P.C.
        2001 Park Place, Suite 1350
        Birmingham, AL 35203
        (205) 251-9000

        Attorneys for the Plaintiff